Case number 2-16-1079, the people of the state of Illinois, Plainton, Appalachia, v. Roy v. Ross v. Dudley & Co. I'm here on behalf of the Attorney General, Mr. Doug H. Johnson. I'm here on behalf of the Plainton, Appalachia, v. David A. Bernhardt. All right, Mr. Johnson. May it please the Court, Counsel. My name is Doug Johnson, and I represent the defendant, William Ross. Mr. Ross is convicted of first-degree murder and is currently serving 49 years. I'd like to address initially the third issue in the case regarding the evidence of gun ownership, which came in multiple instances where the defendant was shown to have possessed guns, firearms, rifles, shotgun at one point in time. It was a motion to eliminate file prior to trial, seeking to bar all this evidence, and the Court let it all in. The basis was Dr. Bloom, who had taken over for Dr. Jones, could not say what type of murder weapon it was. The decomposition of the body prohibited knowing what type of firearm caused his death. They knew it was gunshot wound, I believe at least two, but they didn't know what it was. And due to the nature of guns and reactions, I'm sure anyone who's watched a jury selected or knows about it, that can be very prejudicial. Was there a voir dire about feelings about guns and whether that could be separated and the evidence viewed? I have to say I would imagine there was, but I am unclear. I would say it was insufficient. The way this came in, it would have been insufficient because there was a tortured history of why this gun ownership came in. Because initially the statement, it started with a statement and the defense attorney was going to seek to bar the statement, but then the statement wasn't going to be redacted. And so I would bet that because what was going to come in was not known at the time the jury was questioned, that it was definitely insufficient. Wouldn't the existence of guns or his ownership of guns be relevant generally to his interaction with this person and the prior bad acts that were identified? Or generally that he had access to guns and there is evidence that we have probably a gunshot wound? I believe it would be of very minimal relevance and there's no case like it where the guns of this type would have been admitted. I guess any time where a victim of a shooting or a murder, a murder victim or someone who's been shot, there would be some relevance if you could say at some point in time this person had a gun. But that's all we have here. The statement relies on Hofstetter, which I do believe sets forth the principles about gun ownership and whether it gets in or gun access. But it sets forth the key question. Can the state connect the defendant to the gun or guns? And next, can the state connect the defendant to, I'm sorry, the guns to the crime? Here I concede the state connected the defendant to ownership of a gun or guns at some point in time. References were made to a rifle, a shotgun, a .22, a .45. We don't know if those guns worked. We don't know if the defendant ever fired them. What we know is that he said I inherited some from my father. At some point I had some guns. We don't know when. We don't know when they were present. But they did connect him in a sense to that. What if, and I know this is probably, this is just my musings. What if they had only talked about the .45 that we had some handwritten document relating to? Still, I believe that would have been overly prejudicial because we don't know that a .45 was used to murder this victim. And it certainly would have been less. I'll give you that. But we don't know that a .45 was used. It was not sufficiently tied. I understand the state connected a gun to this crime, but they didn't say which gun, what type of gun was connected. And if this ruling stands, if this court confirms the trial court's ruling, I submit that any time a defendant has some evidence at some time of access to a gun, then that should get in based on what I would believe the wrong precedent to be in a shooting case. In Hostetler, it was known, I think there were three victims that died of being shot by a .22. It was known it was a .22. And so when you look at the other facts of that case, a roommate to the defendant testified, well, I had a .22, and as a matter of fact, it was a Ruger .22 that the state expert said 13 guns could fire, types of gun could fire these .22 bullets found at the scene. That Ruger .22 that actually went missing around the time of the crime was the murder weapon. That's relevant. That should get in. But that is not at all what we have here. The, I know you don't have to say, the state doesn't have to say this type of gun was used, but they have to show it was suitable. They have to show the firearm was suitable for the crime, and in this case, all they did was show, yeah, it was suitable, because any firearm in the world was suitable, pretty much. So just throw one after another out and say, paint this guy as a guy who was kind of what some would deem a gun nut. It can't be enough to have the state say, this defendant had access to a gun at one point, because remember, we don't know that these guns were present prior to the victim's death. They could have been years prior. We don't know that. That is not covered, and there were no guns found in the house where the body was found. Did the state paint the defendant as a gun nut in argument? I think they, the defendant, let's be candid, was a drunk and kind of, you can see from his cross-examination, and he wasn't the MBA from Northwestern graduate at the time of this case. He was a guy who was impaired, and you can see it in the cross-examination, and I think they did a little bit. They would say, they kind of, you know, ridiculed him. You know, where's that gun? Where's that .22? Oh, you gave that one to Ed. Mr. Ed, is that Mr. Ed the horse? I mean, all these things, I think they, yeah, I think they painted him as a nut. They certainly didn't say, this guy's a gun nut or this guy's a crazy, you know, but they did, I think, paint him as a man who had access to an awful lot of guns. In our brief, we cited several cases, Howard, Maldonado, Smith, Jackson, and we said, in all these cases, the courts, this court or the Supreme Court, found error in admitting guns. And the state comes back, and they say, well, yeah, that's different, because in those cases, the actual physical gun was admitted. Now, I submit to you, it's not totally clear that in every case the actual physical gun was admitted. But in any event, it doesn't matter. There is no case I am aware of, and I submit there is no case that puts a different burden of proof on the state if they are going to admit a physical gun or evidence about guns. I don't think there are two divergent burdens of proof. The fact is, it's the same. You're going to put in gun testimony or evidence or the physical gun. It doesn't matter. You have to connect the gun to the crime. It has to be done better than it was done here. Well, speaking of painting the defendant not necessarily as a gun nut, but I think it's pretty obvious that defense pointed out every chance they could, either directly or indirectly, that the man was severely impaired by alcohol. And this affected his whole persona, you know, that could impact his gun, you know, his gun interests or things. But, I mean, the defense did a pretty good job of painting him as somewhat unusual. I do believe so. I believe he's a very skilled trial, very skilled, knowledgeable attorney, defendant, Mr. Ross. And I do believe that was shown to the jury, those things to the jury. But I don't think it changes the fact and probably hurts anybody, someone like that, what could they do with guns. And they hammered it in the interrogation, as I said, over and over again. It was all played for the jury and they asked him about guns. Guns was on there. Guns were referred to for pages and pages of the transcript. They hammered it on cross, as I mentioned. I mentioned about the Mr. Ed comments. On page 841, they said, they asked the defendant about having an awful lot of guns. They showed the picture of the exhibit and said, look, he's got a .45 caliber written down. They returned to the defendant as being the unluckiest man alive that had, quote, all these guns stolen. They argued about how it's amazing how one person could have five guns stolen from him. And the prosecutor also said this. He said, we know the defendant lied initially about owning handguns because, quote, he knew Jackie was killed with a handgun. So that's the state's position. If the state knows that the victim died from a handgun, why didn't we have evidence about shotguns and rifles? That right there shows, well, wait, you're taking the position he knew that, then why are we talking about rifles? Why can't we at least have not had that in the case? It was too, and they referred on 923 about how this man had a bunch of guns. It was all too much in a case that I submit to you was not a case of overwhelming evidence. This case was about Mr. Ross being sort of a drunk, not sort of a guy. In fact, one witness said he looked homeless to me and his house was unkempt. And the gun evidence and the prior, the 2007 instances of alleged domestic abuse or alleged abuse, there was no physical evidence. There was no confession. There were no eyewitnesses. And the time of death was, at best, somewhat confusing. When we say no physical evidence, we do have some fingerprint evidence, don't we? DNA, yes, the DNA, but not DNA. We all know that DNA sounds like it can be in some cases conclusive, and certainly it can't. Here, it's DNA on a piece of glove, it's on a piece of duct tape that was found in his home. I just don't know how that can be deemed on the spectrum of DNA evidence, how that is something that is concrete. Was it found on the tape of the door? Tape of the door, yes. Just in his home, not just like in a drawer or something. Yeah, the tape of the door that was sealed shut. But does that prove that he sealed the door shut, or could it be you get the picture of this house. When we look at it, it is not one that was kept in a nice way. So who knows what could be gathered by whatever was done by whoever did it to put that DNA for it to end up on the door. Well, by the time we actually get into the house as a case, he's been gone for about 14, 18, no, 14, 16 months. Yes, I think they said, I think if you look at it and try to figure out exactly when he left, would that be June of 2012 and the body is found November of 2013 to 18. So we have this piece of this duct tape on the door with DNA. And by all accounts, we may have one person in the house, but that person shouldn't have been in the house. So how else did that fingerprint get there? Well, we. And that DNA get there, I apologize. Well, we do don't. We don't know who got in the house because the plea for a retired police officer, as it happens, had gotten into the house. I'm not saying he's a suspect, but it does not appear that this house was so secure that no one was getting into it or out of it. And remember, the retired police officer went in after January of 2013. So according to the state's evidence, their theory is that Mr. Ross killed this victim. October of 2011. And then left in June of 2012 when the smell got so bad. So that's true. Why in January of 2013, when the retired police officer went over there twice, did he not say anything about the smell? And did he say, I looked around and I saw, he mentions interior doors being open. He didn't see anything that suggested to him something like this had happened. Well, the way this door, at least from the testimony, is described, it could look like just a recess in the wall. It doesn't necessarily look like a door. I suppose it could look like that. I mean, we women put little tchotchkes in those recesses and things. It could have been something like that. There weren't any tchotchkes in this case. So maybe he didn't recognize it as a door. Maybe he didn't. But is this proof beyond a reasonable doubt? Is it proof beyond a reasonable doubt when they say, well, Rene Bitton was told to stay out of the house? That shows you he didn't want anybody in this house. Infer from that he killed this victim. There's nothing like that here. So if we're talking about whether or not the evidence is overwhelming, I submit to you that it was not. And that's why the gun evidence and the related issue, the prior instances of alleged abuse, were so important. I submit that's what he was convicted on. And if I have a moment on that, I would like to say that we argued in issue number two that these prior instances should not have come in. One of the instances, the charges were dismissed, where they said that Mr. Ross beat her up and the police were called. There are no eyewitnesses to that. We don't know exactly what transpired. And in the other one, domestic battery was reduced down to misdemeanor battery, which is not one of the enumerated convictions in the statute that allows. What about similar statutes or similar offenses? Yes, similar offenses, similar convictions. He had a conviction for battery. And I think they are trying to make too much of a jump from Chapman and the statute to say in this case battery. The court could have put battery. The legislators could have said battery is one of the things we'll admit. And they didn't write battery. Well, that's section 20. What about section 7.4? The other, I think it's just overly prejudicial. I don't see a balancing test in the record where the court looked at this. 2007, so many years earlier, no eyewitnesses. We don't really know what happened. What we have here is two drunk people and the police got called. Is that really, for the statute or motive or intent, is that really enough to put that in considering how awful it is for how awful it sounds? When we're talking about murder. Well, it was the September one that resulted in a plea of guilty to battery. I mean, we have evidence that he admitted to battering her in a previous instance, albeit five years before or whatever. Is saying that the guilty plea is an admission of battery? Correct. I just submit people plead guilty for other reasons. They may plead guilty for other reasons. We understand that. But this is the record we have. There is a conviction for this offense that involved the injury to this victim in this house. We don't necessarily have to speculate, and he did not give us reason to speculate. So taking that, we do, so we have a conviction, but unfortunately, how many spouses hit each other, domestic abuse all over? How many of those end up in a murder? Did it really give him a motive to kill her five years later or six years later? Did it really show an intent? We submit that it did not. It was, again, overly prejudicial, and I believe he was convicted on that and the guns. Either one of them alone would have convicted him. Thank you. You have an opportunity for rebuttal. Thank you. Mr. Bernard? Good morning again. Good morning. The domestic abuse shows that a defendant solved his problems not by talking it out but using his fists and eventually a gun. What evidence is there in the record of the August 07 incident that this defendant actually battered the victim? Let me look to give you the specific. Well, the September 07 incident was the one where he plagiarized the battery. Yeah. August 07, police arrived, noticed an injury on her. Of course, we don't hear any testimony about what she said because that would be hearsay. Right. He doesn't make any admissions. He doesn't plead guilty. The case is now across. I mean, what evidence is there that comes in just to show he arrived? The officer arrives at the scene, sees she's bat, she's got bruises on her face or whatever, and that's all we know. I'm trying to remember. Okay. In the A2, which you're asking, she was bleeding from the lips, she was bruised around the mouth, and she had a broken wrist. This is the police testimony. I think that exhibits that force was used. By whom? By the only other person in the house who was the defendant. Granted, there was nothing in the record that would state there was anybody else there, and then he admitted to it. He bled down to a battery. No, no, no, no. No, we're talking about the August one. Oh, the August one. I'm sorry. In fact, in that one, he didn't even want to let the officer in the door, but I think that's when he looked through and saw her. Yeah, she was crying behind him. She had, you know. Holding onto her wrist. Yeah, again, bloody lip and abrasions around her neck. So this was a person who used violence to solve problems. Circumstantially, since we don't know. Circumstantially, correct. As far as the gun issue, this evidence goes to weight. I think it's relevant, but the jury, you know, can either, you know, say, well, okay, he had some guns at one time. Is this important or not? But what, you know, how should we say. It goes to weight that a trial or fact may put on it. What about the balancing? That the evidence that was presented about the guns versus the prejudice to the defendant. Since it was, we don't know what killed the victim. Apparently now the state acknowledged it was a handgun, not a shotgun, not a rifle. What possible relevance is a shotgun and a rifle? And where's the balance? Well, I think the balance is it shows that the defendant had access to guns. He was familiar with guns. He knew how to use guns. I think that was the most important part of it. But that wasn't argued. How do we know he knew how to use a gun? Well, someone who has five handguns, then I would imagine, I think, that common sense, if you talk to most people, they say, well, you have five firearms. You have a rifle. You have handguns. You do know how to use them. The note contained particular description of this handgun, too, of someone who was familiar with firearms. Now, I didn't understand anything about it, but it did describe what that .45, the description of that .45. Where's the connection to those guns and this crime? Or to those guns and, as counsel pointed out, that any of those guns was suitable to have killed this victim? Well, the expert stated that it was most likely gunshot wounds to the spine and to the head. So any gun is then relevant? Well, not a pellet gun, I guess, but I would say yes. I mean, the forensic pathologist, I think, ruled out a shotgun, and yet we heard evidence that he owned a shotgun. Is that an error? If it was, it was certainly harmless. And why? Why is it harmless? Well, again, he couldn't tell. Which he? Are you talking about the forensic pathologist? Yeah. He said it was some type of gunshot wound. Now, we don't know what kind of shotgun it was. Why could it have caused it? Maybe a pellet gun would be relevant then. I'm sorry. Then is a pellet gun relevant? No, a pellet gun isn't relevant to this case. It's a gunshot. Yeah, but it's not penetrating the skin usually. Here it has penetrated the skull and the spine. So should we put a rule of law in the books that says that any time a crime is committed with any type of a firearm, the defendant's possessions of any number of firearms at some time in the past, when we're going to win, is relevant? Well, no, I don't think it is. No general will like this, but again, this shows that he had access and familiarity with the guns. And it is relevant to the fact that the victim was killed with guns, with a gun, by a gunshot, two gunshots. So, you know, a hard and fast rule? No, but certainly in this case, as an Hofstetter, were they allowed that circumstantial evidence? Hofstetter said it was a lot more specific. It was a .22. It was this .22. It was here. Now it's gone. Now it's back. I mean, it's a far cry factually from the time frames which are at best sought here. Okay. And if that's what Your Honor believes, it's still harmless there because of the strength of the case. And I disagree with you on that point, but the fact is we have a very strong circumstantial case. I mean, you have the DNA evidence. It was a glove stuck to a piece of duct tape that was stuck to the trim. I mean, that's pretty good evidence. We have all the receipts from Ace Harbor, Home Depot. Him going and getting all the supplies, these supplies like duct tape, air fresheners, caulk, trim. And he was identified by one of the cashiers at Ace Harbor as he came in early June to purchase these products. We have – Well, he's leaving to go on his year-and-a-half or better road trip, and he wants to secure his house. Isn't that also an inference that could be drawn from the fact that he's getting these items? It's certainly an inference. It is a reasonable – a reasonable inference if he's going home. Maybe he buys a bolt lock. Maybe he buys some things that, you know, for windows people can't get in, you know, those locks for windows. You don't buy caulk, tape, trim, and make it look like there isn't even a door there. And we have his ex-girlfriend's testimony, Benton, Renee Benton, I think. He told her, can you please cut my grass, but stay out of the house. He called her every day. Does he ever acknowledge those things to the police that he told her to stay out of the house or that he wanted her to cut the grass? Because we get this testimony from Ms. Benton, but do we get it from anybody else? I think he does acknowledge that she was supposed to kind of take care of the outside of the house and keep an eye on the house. Although he also called her a thief and a liar on a regular basis in his discussions. But again, that becomes, you know, jury has to make that credibility decision. You know, he said the house is flooding. They go and check in the house. Water's running down the walls. She calls him. He tells her, stay out of the house. Who would do that?  The house is flooding. The police tell her to stay out, too, when she calls the police. It's not your problem. Don't go in there. That's a different reason, though. It's not the police property inside the house. It's not his house. It's not your problem. Don't go in my house. I don't think that's a reasonable inference, considering everything else. Sealing up the room. He nailed, screwed in all the doors, every window. This was someone who was hiding something. Is this the only inside door that is sealed in any way? I know the outside doors are, with the exception of that back door. But the point being... My understanding is that's the only door that was sealed and covered up. And he says the reason he does this is because he has expensive stuff in there. Right. And he still had a TV outside of it, a laptop outside that room. The victim's bicycle was still there. And where were all those important possessions in that bedroom? There was a heater. There was a space heater, right. And the victim, with all of her personal possessions, her checkbook, her appointment book, things, her purse, and all of those that the last dates contained it was in the end of September. Which puts it sometime after that time, soon after that time, she became the victim, his girlfriend. We have the car. Her car sat in a driveway. A neighbor testified that, you know, I didn't see her for quite a lengthy period. And the car was still in the driveway. And then one day it was gone, her car. What's the reasonable inference there? He said she went to Missouri. She didn't take her car. I could see maybe not take her bicycle. She didn't take all of her possessions, her purse, her checkbook. Well, these are, you know, pretty hard, solid facts here that place him in that house for that amount of time. You have to remember he bought a lot of air fresheners. And if someone couldn't smell, you understand, asked earlier, you know, why didn't this policeman smell? Well, the body was decomposed. It was gone by the time they found it with skeletal remains, which made it more difficult for the forensic science test. Well, I guess, was the evidence that it would have been skeletal remains in that January of, what, 2013 when he went in there? Because that's when I thought the police officer actually went in, sometime in January of 2013, about 11 months, 10 months before. So do we have forensic evidence that says if the death occurred at XYZ, the decomposition would have been completed by this date? Well, I don't think it was that specific, and they can't be. The entomologist said it was sometime between October and June of 12. She found him 13. He said, you know, I guess it's the bug testimony of, you know, what's taken care of. You know, he places that as the expert testimony. But when they finally found the victim, basically, you know, she was a skeleton. Let's see. Do managers have any other questions? Thank you. Mr. Johnson, you may reply if you wish. I think the key here is that the State was asked, quote, by Your Honor, was any gun relevant? And the State said yes, and I think that is the danger of this case. If this ruling stands, then in a future case, then, as I said before, any gun would be relevant when the victim is harmed or dies from a gunshot wound. So then the question becomes, is it harmless error? And yes, there's DNA. But the testing, if you look at the record and the briefs, the testing was not complete on that door. We don't know what else was on this door. Perhaps if the door or that area is tested and all these things are looked at and you only find the defendant on there, that would be a little stronger. But what if you find other people? For instance, there was a hair found in the ceiling of that door, and that was not tested. I just submit this is DNA evidence, but it's on the low end of probative DNA evidence. All right, but once they get past that DNA evidence, they have defendant's statement to the police, well, you know, I was away for a short time and I thought we'd had some problems and I thought she went back to Missouri, that's where she came from. If somebody goes someplace that they used to be, and I'm going to go back to the woman card, we put trash keys here, we take our purse, we take our ID, we take our clothes. All of those things are in that room. How did they remain in that room if she went to Missouri? I mean, how does that statement that I thought she went to Missouri make any sense in light of what's found in that room? He doesn't know where she went. He's in there in Las Vegas, confronted by the police, a man with certain mental defects, and he's being hammered about what happened to her. Yes, someone would take her things, but there's no issue here. This woman was murdered, but leaving her things there, does that mean he did it? I submit to you it's not proof beyond a reasonable doubt, and we have to speculate, why didn't she take her things? Why did he tell Renee Bitton not to go in the house? That's not proof beyond a reasonable doubt. Well, then we tell, then we listen to the rest of what he tells the police, that is, before the jury, that, well, she was dealing drugs and she was in all sorts of strange deals, and, you know, this probably happened after I left, and, in fact, Renee found a needle in her arm, and I didn't see any other evidence of that, but I guess he's still in that house in June of 2012. His own admission, I believe, he said, I left something. And it's his house, and this room is directly across from his. Is it reasonable to believe he never opened that door to see where she was? I think, again, proof beyond a reasonable doubt. I mean, would one expect this man to open that door? Maybe. But you get a picture from this record, and I have to separate what's in the record from what I've learned. This man is sick, and how he lives is different, I submit, than everybody in this room. But what he was doing and how he behaved, whether or not he wanted to go to Home Depot and buy things with a credit card where there would be a record of it, that's just purchase of home and proof that items, and there were other things in that dilapidated house. Well, strangely enough, this record also shows that the neighbors who were around, who saw him, some of the people who actually knew him, the retired police officer, his behavior starts to change after he gets back from this trip. After the trip that he talks about in Las Vegas, and when he believes she's gone, that's when his behavior starts to change. He grows the beard. He seems extremely unkempt. Before that, they said he was a pretty good-looking guy. So can't the jury put that together, that something happened at that time? That seems, again, when we're talking about proof beyond a reasonable doubt, that seems like jumping inferences. And one of the neighbors, I believe, said, well, I'm disabled, I don't have much to do, so I stare out my window, and I saw this guy, and he was not nice. Like, I'd wave to him, and he wouldn't be nice back. He wouldn't wave back to me. I mean, I think their testimony is tainted by that. Or the woman next door who said, I remember his lights were on once all night. Those things, I think there should be a trial where we don't hear about guns, we don't hear about alleged incidences, abuse where the charges were dismissed, and let's let the jury hear those things and then see if they believe that that is proof beyond a reasonable doubt. Thank you. Thank you both counsel for your arguments today. Again, we'll take the matter under advisement. We will end the decision in due course, and we now do stand adjourned for the day. Thank you.